## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | : Honorable Mark Falk |
| | : |
| | : Mag. No. 18-3789 |
| v. | : |
| | : **CRIMINAL COMPLAINT** |
| MICHAEL HEALY | : |
| | : |

I, Jason Frederick, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

**SEE ATTACHMENT A**

I further state that I am a Special Agent with the Federal Bureau of Investigations, and that this complaint is based on the following facts:

**SEE ATTACHMENT B**

Continued on the attached page and made a part hereof:

_____
Special Agent Jason Frederick
United States Department of Justice
Federal Bureau of Investigations

Sworn to before me and subscribed in my presence,
this 9th day of November, 2018 in Newark, New Jersey

HONORABLE MARK FALK                 _____
UNITED STATES MAGISTRATE JUDGE      Signature of Judicial Officer

## ATTACHMENT A

### COUNT ONE
(Conspiracy to Distribute Controlled Substances)

On or about April 18, 2014 up to and including November 7, 2018, in Essex County, in the District of New Jersey and elsewhere, the defendant,

### MICHAEL HEALY

did knowingly and intentionally conspire and agree with others to distribute and possess with intent to distribute a mixture and substance containing a detectable amount of 3,4-methylenedioxymethamphetamine, a/k/a "MDMA," or "ecstasy," a Schedule I controlled substance; a mixture and substance containing a detectable amount of marijuana, a Schedule I controlled substance; a mixture and substance containing one kilogram or more of heroin, a Schedule II controlled substance; and a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance contrary to Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A).

In violation of Title 21, United States Code, Sections 846.

## ATTACHMENT B

I, Jason Frederick, am a Special Agent with the Federal Bureau of Investigation. I am fully familiar with the facts set forth herein based on my own investigation, my conversations with other law enforcement officers, and my review of reports, documents, and photographs of the evidence. Where statements of others are related herein, they are related in substance and part. Because this complaint is being submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

1. In or around the beginning of 2014, law enforcement began investigating a drug trafficking organization ("DTO") operating in the Essex County, New Jersey area. Among those being investigated were individuals associated with a residence at 293 Ampere Parkway in Bloomfield, NJ ("the residence"). Law enforcement has identified several members of this DTO, including: defendant Michael HEALY, a/k/a "Shady" ("HEALY"); and at least five other co-conspirators ("CC-1"; "CC-2"; "CC-3"; "CC-4"; and "CC-5")[1].

2. On or about April 18, 2014 detectives from the Union County Prosecutor's Office executed a search warrant at the residence. Recovered during the execution were:

   a. 40 Suboxone pills
   b. 13 white pills marked "K57"
   c. 4 yellow pills marked "R039"
   d. 6½ Percocet pills
   e. Ziploc bag containing greenish vegetation suspected to be marijuana
   f. 5 large clear plastic bags containing green vegetation suspected to be marijuana
   g. $20,000 found in stacks of $100 bills
   h. $55,000 found in stacks of various denominations
   i. 6 vacuum sealed bags containing suspected marijuana cookies
   j. 4 ziploc bags containing a white powdery substance

3. At that time, CC-1, CC-2 and CC-3 were present at the residence. CC-3 gave a spontaneous statement to the officers that all of the marijuana

---

[1] CC-1 and CC-2 were murdered in separate incidents in March and April 2018.

and U.S. currency belonged to him/her and that he/she was willing to give a sworn statement attesting to this.

4. On or about June 2, 2017, law enforcement executed another search warrant at the residence. CC-1, CC-2 and CC-3 were present in the residence at the time of the execution of the warrant.

5. During the course of the execution of that search warrant, law enforcement recovered approximately 34 grams of cocaine, approximately 326 grams of a powdery substance believed to be an opiate, and various items commonly associated with the distribution of controlled substances. Immediately after the execution of the search warrant, CC-1 gave law enforcement a sworn statement admitting that the drugs and other materials found in the residence were his and his alone.

6. Since the time of the execution of the June 2017 search warrant, the Drug Enforcement Administration (the "DEA") and Union County Prosecutor's Office began an investigation into the DTO. As part of that investigation, the DEA developed a confidential source who provided them with information about the DTO. Based upon the information provided by that source, the DEA and Union County Prosecutor's Office identified a Nissan motor vehicle (the "Nissan") that was to be used by the DTO to transport controlled substances. As part of that investigation, the DEA and Union County Prosecutor's Office placed a GPS tracking device on the vehicle. That tracking device was active for approximately 30 days in or about December 2017, but was not active thereafter.

7. During the course of this investigation, law enforcement spoke with a cooperating witness ("CW-1") who provided information regarding the DTO.

8. CW-1 identified HEALY as the leader of the DTO. According to CW-1, HEALY, CC-1, CC-2 and CC-3 were selling between 30-50 kilos of heroin/cocaine in New Jersey and elsewhere on a monthly basis. CW-1 further stated that an individual in California (co-conspirator-4, ""CC-4") supplied the DTO with its controlled substances. CW-1 met CC-4 on one or more occasions and has positively identified that individual.

9. CW-1 stated that HEALY, CC-1 and CC-3 transported the controlled substances to New Jersey by various means, including by car, plane, or mail. CW-1 was aware that HEALY and CC-4 had a plane and a blue Nissan that they used primarily to transport controlled substances. CW-1 was further aware that at one point, both the plane and the Nissan were parked at a hangar somewhere in Monmouth County, NJ.

10. CW-1 explained that after quantities of various controlled

substances were transported from California to New Jersey, the DTO used the residence to make pills and press kilogram quantities of cocaine. CW-1 was aware that the DTO kept a large pill press in a detached garage behind the residence. Based upon information provided by CW-1, law enforcement executed a search warrant at the detached garage at the residence in April 2018. During the course of the execution of that search warrant, law enforcement recovered a large pill press and various presses commonly used to package kilogram quantities of cocaine.

11. CW-1 was aware that on several occasions between 2014 and 2018 that HEALY and CC-3 traveled to Baltimore, Maryland for the purpose of distributing fentanyl to the local drug dealers in that City. During the course of this investigation, law enforcement learned that HEALY had been arrested previously in Baltimore and had served a fifteen (15) year prison sentence for armed robbery there.

12. CW-1 was also aware that during the relevant time period, CC-3 flew to China for the purpose of obtaining a large quantity of MDMA, or "Molly." According to CW-1, after CC-3's trip to China, CC-1 and CC-3 received quantities of MDMA through the mail, and then re-distributed the MDMA to street level drug dealers in Essex County, New Jersey and elsewhere. During the course of the investigation, and based upon CW-1's statement, law enforcement obtained United States government records which confirmed that CC-3 had traveled to China in the relevant time period.

13. CW-1 further stated that he/she was aware of the 2014 seizure by the Union County authorities from the residence. According to CW-1, the money that was seized from the residence was proceeds from the DTO's illicit activity and was owed to HEALY. CW-1 further stated that CC-3 took ownership of the money and the drugs seized from the residence to insulate HEALY from investigation and out of fear that HEALY would retaliate against CC-3 and CC-1 for having lost the money and drugs.

14. During the course of this investigation, a second cooperating witness ("CW-2") has provided information regarding the DTO. CW-2 stated that CC-3 worked for "Shady" and positively identified HEALY as "Shady." CW-2 further stated that he/she knew CC-1, and was aware that CC-1 was engaged in the distribution of controlled substances in Essex and Union Counties and elsewhere along with CC-3 and HEALY.

15. Law enforcement has also interviewed a third cooperating witness (CW-3) who has knowledge of the workings of the DTO. According to CW-3, HEALY arranged the purchases of large quantities of marijuana, cocaine and fentanyl from California beginning in or about 2014. According to CW-3, HEALY is a ranking member of the Bloods street gang with ties to other ranking members of the gang on the West Coast.

16. CW-3 stated that since 2014, HEALY, and CC's -1, -2 and -3 have made multiple trips to California in order to arrange the shipment of controlled substances to New Jersey. At the outset, HEALY, and CC's -1, -2 and -3 sent money to California and then arranged to mail the controlled substances back to New Jersey in exchange. According to CW-3, those return mailings frequently contained multiple kilogram quantities of cocaine, in addition to kilogram quantities of heroin/fentanyl and substantial quantities of marijuana. CW-3 was also aware that CC-3 was responsible for transporting the fentanyl to Baltimore for further distribution.

17. At some point in 2017, the DTO used a small plane to ship the controlled substances from California to New Jersey. According to CW-3, once the plane landed at an airport in New Jersey, HEALY, CC-3 and others arranged to have a car with a concealed compartment—commonly known as a "trap"—meet the plane at the airport. The controlled substances were then to be loaded into the trap for transportation to other locations in New Jersey.

18. Based upon the information provided by CW-3 and other information developed during the course of the investigation, law enforcement located the Nissan parked outside of a maintenance hangar at a small airport in New Jersey. The Nissan was seized by law enforcement. A subsequent search of the Nissan revealed, among other things, that it had been outfitted with a trap.

19. Law enforcement has also interviewed a fourth cooperating witness (CW-4) in the course of this investigation. CW-4 told law enforcement that as early as 2015, he/she was aware that CC-4 and HEALY were working together to ship controlled substances from California to the Newark, New Jersey area.

20. According to CW-4, HEALY paid CC-4 to obtain controlled substances including marijuana, cocaine, and heroin. HEALY then had the drugs shipped to New Jersey for resale in the Newark-area.

21. Based upon information developed during the course of the investigation, law enforcement became aware thatCC-5was charged with distributing heroin on HEALY's behalf in New Jersey. The investigation revealed that the heroin was being packaged for street distribution at 18 Ellington Street, Apartment 1B in East Orange, N.J. ("ELLINGTON PROPERTY") and at 468 3rd Avenue West, First Floor in Newark, N.J. ("468 PROPERTY").

22. On or about November 1, 2018, the Hon. Steven C. Mannion issued a search warrant for the ELLINGTON PROPERTY. On or about November 7, 2018, the Hon. Mark Falk issued a search warrant for the 468 PROPERTY. On November 7, 2018, members of law enforcement executed both search warrants.

23.   During a search of the ELLINGTON PROPERTY, law enforcement recovered, among other things, approximately 1,719 glassine envelopes containing a white powdery substance believed to be heroin. A number of those envelopes were banded together in groups of 50 envelopes each, commonly referred to as a "brick." In addition to the packaged heroin, law enforcement recovered approximately 212 grams of a white powdery substance believed to be heroin that had not yet been packaged into the glassine envelopes. In total, law enforcement recovered approximately 34 "bricks" of suspected heroin at the ELLINGTON PROPERTY. Also recovered was, approximately 40 grams of crack and approximately 40 grams of an unknown white powdery substance. Further, during the search of the ELLINGTON PROPERTY, law enforcement recovered a substantial quantity of materials commonly used to package heroin for street-level distribution purposes.

24.   Law enforcement also made entry into the 468 PROPERTY to execute the search warrant at that location. During the subsequent search of the 468 PROPERTY, law enforcement recovered an additional 237 glassine envelopes of heroin (approximately 5 bricks of suspected heroin) and additional quantities of packaging materials.